COURT OF APPEALS
SECOND 
DISTRICT OF TEXAS
FORT WORTH
 
NO. 
2-02-331-CV
  
  
COLUMBIA 
MEDICAL CENTER OF                                          APPELLANTS
LAS 
COLINAS D/B/A LAS COLINAS
MEDICAL 
CENTER AND LISA CRAIN, R.N.
   
V.
  
NORMA 
BUSH, AS NEXT FRIEND AND AS                                  APPELLEE
GUARDIAN 
OF SCOTT BUSH
  
------------
 
FROM 
THE 141ST DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
I. Introduction
        Appellants 
Columbia Medical Center of Las Colinas d/b/a Las Colinas Medical Center 
(“Medical Center”) and Lisa Crain, R.N. (“Nurse Crain”) appeal the 
judgment rendered against them and in favor of Scott Bush following a 
fourteen-day jury trial. Appellants raise four issues[1] 
challenging the legal and factual sufficiency of the evidence to support various 
jury findings, one jury charge issue based on Casteel,[2] 
one issue complaining of allegedly conflicting jury findings, one issue claiming 
the Medical Center was entitled to an offset from Scott’s past medical 
expenses, and one issue complaining of improper jury argument. We will affirm 
the trial court’s judgment.
II. 
Background Facts
        Scott, 
a forty-six-year-old optometrist, suffered from ventricular tachycardia, or 
rapid heartbeat. Scott’s doctor diagnosed him with this condition in 1998 and 
prescribed Tambocor, a drug to depress the electrical activity of Scott’s 
heart. On January 19, 2000, Scott’s heart “started feeling funny.” He took 
a Tambocor tablet and tried to relax. When his heartbeat did not return to 
normal, at around 11:00 p.m., a friend took Scott to the emergency room at Las 
Colinas Medical Center.
        Nurse 
Crain, an emergency room nurse at the Medical Center, took Scott’s initial 
information. Scott told Nurse Crain that he was suffering from ventricular 
tachycardia. He explained that although he had taken Tambocor earlier that 
evening, his heartbeat would not return to normal. Nurse Crain wrote this 
information on the emergency room intake form. Emergency room personnel 
performed an EKG on Scott and confirmed that he was experiencing ventricular 
tachycardia.
        Scott 
indicated when he arrived at the Medical Center that he did not want to be 
“shocked,” that is, cardioverted. Scott was conscious, stable, and in no 
pain. So, Dr. Kimberly Zeh (“Zeh”), the emergency room doctor, ordered two 
different injections for Scott and one intravenous drip, but Scott’s 
accelerated heartbeat continued. Dr. Zeh contacted the on-call cardiologist, Dr. 
John Osborne (“Dr. Osborne”), and as a result of her conversation with Dr. 
Osborne, she ordered that five milligrams of Verapamil be administered to Scott. 
Eric Johansen (“Johansen”), a paramedic working in the Medical Center’s 
emergency room as an employee, administered the drug to Scott. Within two 
minutes, Scott’s blood pressure “crashed,” he had a convulsion, and he 
went into cardiac arrest.
        Scott 
suffered brain damage from the lack of adequate oxygenation of his brain during 
his cardiac arrest. He resides in a nursing home, and although he breathes on 
his own, he lacks any independent motor function and is unable to speak.
III. Legal and Factual Sufficiency of the Evidence
        In 
their first issue, Appellants contend that legally and factually insufficient 
evidence exists to support the jury’s finding in special question 1 that their 
negligence proximately caused Scott’s injuries. Specifically, Appellants 
challenge the evidence supporting the jury’s finding of proximate cause.[3]  In their third issue, Appellants contend that the 
jury’s malice finding is not supported by legally and factually sufficient 
evidence.
        A. 
Standards of Review
        1. Legal Sufficiency
        In 
determining a “no-evidence” issue, we are to consider only the evidence and 
inferences that tend to support the finding and disregard all evidence and 
inferences to the contrary. Bradford v. Vento, 48 S.W.3d 749, 754 (Tex. 
2001); Cont’l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 
1996); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). 
Anything more than a scintilla of evidence is legally sufficient to support the 
finding. Cazarez, 937 S.W.2d at 450; Leitch v. Hornsby, 935 S.W.2d 
114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence 
furnishes some reasonable basis for differing conclusions by reasonable minds 
about the existence of a vital fact. Rocor Int’l, Inc. v. Nat’l Union 
Fire Ins. Co., 77 S.W.3d 253, 262 (Tex. 2002).
        2. Factual Sufficiency
        An 
assertion that the evidence is “insufficient” to support a fact finding 
means that the evidence supporting the finding is so weak or the evidence to the 
contrary is so overwhelming that the answer should be set aside and a new trial 
ordered. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). We are 
required to consider all of the evidence in the case in making this 
determination. Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 
(Tex.), cert. denied, 525 U.S. 1017 (1998).
 
3. Legal and Factual Sufficiency Challenges in Light 
of Clear and Convincing Evidence Burden of Proof on Malice
        The 
Texas Supreme Court recently clarified the appellate standards of review to be 
applied to legal and factual sufficiency of the evidence challenges in light of 
the clear and convincing burden of proof. Accord In re J.F.C., 96 
S.W.3d 256, 264-68 (Tex. 2002) (discussing legal sufficiency review in 
termination of parental rights appeal); In re C.H., 89 S.W.3d 17, 
25 (Tex. 2002) (discussing factual sufficiency review in termination of parental 
rights appeal). Both legal and factual sufficiency reviews of a finding required 
to be based on clear and convincing evidence must take into consideration 
whether the evidence is such that a fact finder could reasonably form a firm 
belief or conviction about the truth of the matter required to be established by 
clear and convincing evidence. J.F.C., 96 S.W.3d at 265-66; C.H., 
89 S.W.3d at 25; see also Kroger Tex. Ltd. P’ship v. Suberu, 113 S.W.3d 
588, 601 (Tex. App.—Dallas 2003, pet. filed) (applying standards of review 
enunciated in J.F.C. and C.H. to legal and factual sufficiency 
challenges to evidence of malice).
        With 
respect to a legal sufficiency point, we “look at all the evidence in the 
light most favorable to the finding to determine whether a reasonable trier of 
fact could have formed a firm belief or conviction that its finding was true.” 
J.F.C., 96 S.W.3d at 266. In determining a factual sufficiency point, we 
must give due consideration to evidence that the fact finder could reasonably 
have found to be clear and convincing and then determine whether, based on the 
entire record, a fact finder could reasonably form a firm conviction or belief 
of the matter required to be proved by clear and convincing evidence. C.H., 
89 S.W.3d at 25. If, in light of the entire record, the disputed evidence that a 
reasonable fact finder could not have credited in favor of the finding is so 
significant that a fact finder could not have reasonably formed a firm 
conviction or belief, then the evidence is factually insufficient. Id.; Kroger, 
113 S.W.3d at 601.
        B. 
Evidence of Proximate Cause and Malice
        Verapamil 
is a drug that is contraindicated for treatment of ventricular tachycardia. 
Given to patients with ventricular tachycardia, it can lead to “disastrous 
consequences,” including death. Verapamil may be effective to slow rapid 
heartbeat caused by supraventricular tachycardia — tachycardia originating 
superior to or above the heart’s ventricals. However, distinguishing 
supraventricular tachycardia from ventricular tachycardia is difficult, and 
ventricular tachycardia is more common than supraventricular tachycardia. 
Therefore, the medical literature, including the Advanced Cardiac Life Support 
(“ACLS”) manual, warns all medical personnel to simply assume that 
“wide-complex” tachycardia and “wide-QRS,” that is tachycardia that may 
be ventricular or supraventricular, is in fact ventricular tachycardia.
        The 
ACLS manual repeatedly warns against giving Verapamil to patients experiencing 
ventricular tachycardia:
Wide-QRS 
tachycardia of uncertain origin should be considered VT [ventricular 
tachycardia] and treated as such until proven otherwise. . . . If the patient is 
stable in the presence of rapid, wide-QRS tachycardia, do not treat with [V]erapamil but consider such 
agents as procainamide.

                In 
summary, emergency care providers should remember:
                Rule 
No. 1: Wide-QRS tachycardia is VT until proven otherwise.
                Rule 
No. 2: Always remember rule No. 1.
Under 
“Critical Points to Remember,” the ACLS manual again warns:
Administration 
of [V]erapamil to a patient with VT can be a lethal 
error. Verapamil can accelerate the heart rate and decrease the blood 
pressure . . . . Authors have reported numerous examples of adverse effects, 
including death. Do not give Verapamil to patients with a wide-complex 
tachycardia unless the tachycardia is known with certainty to be 
supraventricular in origin.

The 
ACLS tachycardia algorithm[4]  again warns, 
“Verapamil is not effective for the treatment of most types of ventricular 
tachycardia” because “[i]t may induce severe hypotension and predispose the 
patient to the development of ventricular fibrillation.” Finally, the ACLS 
manual states, “The tachycardia algorithm was carefully constructed to 
restrict the use of Verapamil to only patients with narrow-complex PSVT with 
normal or elevated blood pressures.” The package insert for Verapamil likewise 
specifically warns that Verapamil is contraindicated for ventricular tachycardia 
and explains that “administration of intravenous Verapamil to patients with 
wide-complex ventricular-tachycardia can result in marked hemodynamic 
deterioration and ventricular fibrillation.”
        On 
the evening of January 19, 2000, when Dr. Zeh ordered that Verapamil be given to 
Scott, the following individuals were in Scott’s treatment room: Nurse Crain; 
Alma Heskes, R.N., (“Nurse Heskes”) the House Supervisor (top/head nurse) at 
the Medical Center and part of the Medical Center’s administration; Johansen; 
and Dr. Zeh.[5]
        Nurse 
Crain testified that she was ACLS certified, i.e., certified in Advanced Cardiac 
Life Support. This certification requires the applicant to know the material set 
forth in the ACLS manual and to take and pass a test over the material. An 
emergency room nurse should know ACLS protocol.
        Nurse 
Crain testified that she was aware of all of the above recited warnings 
contained in the ACLS manual concerning the administration of Verapamil to a 
patient experiencing ventricular tachycardia. When Dr. Zeh ordered Verapamil for 
Scott, Nurse Crain immediately had a serious question about whether Verapamil 
was an appropriate medication for him. She said, “Verapamil, are you sure?” 
and Dr. Zeh said, “Yes.”[6]  Nonetheless, 
even after Dr. Zeh said “yes,” Nurse Crain still had a serious question 
about whether Verapamil was an appropriate medication for Scott. She knew that 
Dr. Zeh’s order for Verapamil presented an “extreme degree of risk” to 
Scott. Specifically, Nurse Crain testified:
Q. 
. . . Based upon the information that you knew as a nurse, based upon the 
information that we have already gone over this morning, severe decrease in 
blood pressure is exactly what can happen if you give Verapamil to a patient 
with ventricular tachycardia, correct?
 
A. 
It’s possible that could happen.
 
Q. 
As a matter of fact, according to the ACLS manual, it can have disastrous 
consequences?
 
A. 
It says that it can be lethal.
 
Q. 
It can be lethal, and it can have “disastrous consequences.” (Indicating) 
Isn’t that what it says?
 
A. 
Yes, sir.
 
Q. 
When the order was given for Verapamil, and you said, “Verapamil, are you 
sure?” to Dr. Zeh, and she said something like, “Yes, Verapamil”; did I 
get that right so far?
 
A. 
That is correct.
 
Q. 
And you still had your serious question, as we have already established?
 
A. 
Yes, sir.
 
Q. 
You knew that there was the potential for causing harm because there was an 
extreme degree of risk in giving Verapamil to Scott Bush, correct?
 
A. 
Yes.

Nurse 
Crain agreed that the nursing standard of care required her to intervene to 
prevent complications in a patient’s condition and that her failure to 
intervene would be a violation of the nursing standard of care. She agreed that 
the nursing standard of care required her to exercise her own nursing judgment 
if she felt a doctor ordered a medicine with adverse consequences to the 
patient.
        A 
Medical Center policy entitled “Protocol to Follow When a Nurse Questions A 
Physician Order” provides, in pertinent part:
        POLICY:     To 
ensure the safety and rights of the patient, Las Colinas Medical Center has 
developed the following protocol in conjunction with the medical staff for the 
nurse to follow whenever a question arises regarding a physician order or the 
attending physician cannot be reached.
 
        PROCEDURE:
 
                         A.     If 
a nurse has any reason to doubt or question the care provided to any patient or 
believes that appropriate consultation is needed and has not been obtained, 
he/she shall call this to the attention of his/her superior who in turn may 
refer the matter to the House Supervisor. If warranted, the House Supervisor may 
bring the matter to the attention of the attending physician, the Chief 
Operations Officer, the Chief of Staff, or the Department Chairman, as 
appropriate. . . .
 
                         B.     Nursing 
personnel are responsible for the “knowledge of the rationale for and the 
effects thereof, in the administration of medications and/or treatments as 
prescribed by a licensed physician or dentist.” Therefore, nurses are 
responsible for questioning medications ordered prior to administering the drug. 
Such action should not delay administration of the drug. When a nurse has 
reason to question any order and a delay in administration of the drug or 
treatment will be necessitated the prescribing physician will be notified. In 
addition referral will be made to the House Supervisor. [Emphasis added.]
Nurse 
Crain testified that this Medical Center policy imposed a separate duty upon her 
to intervene before Verapamil was administered to Scott.
        Finally, 
Nurse Crain testified:
Q. 
So basically what this amounts to is that with your serious question, knowing 
that there was an extreme degree of risk that was going to cause potential harm 
to Scott Bush, knowing all that, you still chose to allow him to be given the 
Verapamil anyway?
 
A. 
Yes, I did.

        Nurse 
Heskes testified that she walked into Scott’s treatment room and asked, 
“What’s going on?” Although Nurse Heskes could not remember exactly what 
response she received to this question, she learned that Scott was in 
ventricular tachycardia and that he had been given lidocaine and Bretylium. 
Except for his tachycardia, Scott was stable in all respects when Nurse Heskes 
entered the treatment room.
        Although 
Nurse Heskes’s ACLS certification was lapsed on the night Scott came into the 
emergency room, Nurse Heskes had been ACLS certified in the past and knew that 
giving Verapamil to a patient with ventricular tachycardia could be a lethal 
error; she knew Verapamil was contraindicated for ventricular tachycardia. Nurse 
Heskes testified that she had a serious question about allowing Verapamil to be 
given to Scott. She admitted that both her job description with the Medical 
Center and the nursing standard of care required her to intervene if she or a 
nurse she was supervising had a serious question about the administration of a 
medicine involving an extreme risk of harm to a patient. She testified that 
despite her duty to intervene, she did not. Nurse Heskes testified:
Q. 
And when you found out that a nurse that was under your supervision, since you 
were the top nurse at the entire hospital that night, a nurse under your 
supervision was having a serious question about a medication that she felt 
involved an extreme risk of harm to a patient, you had an obligation under your 
own job description to intervene, didn’t you?
 
A. 
Yes.
 
Q. 
But as we have already seen, you didn’t do that, did you?
 
A. 
I didn’t intervene, though I heard – can I answer you more? Oh.
 
Q. 
You didn’t intervene, did you?
 
A. 
I did not intervene.
 
Q. 
But you had a duty to intervene, didn’t you?
 
A. 
Yes.
 
Q. 
And you breached that duty by not intervening, didn’t you?
 
A. 
I may have breached.

Nurse 
Heskes further testified:
Q. 
. . . Ms. Heskes, even with the serious question that you had, knowing that 
there was an extreme degree of risk that could cause potential and serious harm 
to a patient like Scott Bush in his condition, you failed to intervene and 
simply allowed Verapamil to be injected into Scott Bush, didn’t you?
 
A. 
The Verapamil was given.
 
Q. 
Is that a yes?
 
A. 
Yes.
        Johansen 
was the first paramedic ever employed by the Medical Center to work in its 
emergency room. Consequently, the Medical Center had no written job description 
for emergency room paramedics. Soon after he was hired, Johansen met with Dr. 
Brian Zachriah (“Dr. Zachriah”), the head of the Medical Center’s 
Emergency Department, concerning his emergency room paramedic job description. 
Johansen took notes during this meeting, but even eight months later, when 
Johansen injected Scott with Verapamil, the Medical Center had not finalized his 
job description. Nothing in Johansen’s notes from the meeting with Dr. 
Zachriah and nothing in any approved Medical Center policy or job description 
authorized Johansen to administer cardiac medications in the emergency room. In 
fact, a Medical Center policy titled “Procedures Performed by Non 
Physicians” prohibited a paramedic like Johansen from administering cardiac 
medications.
        Johansen 
was ACLS certified. He knew Scott was experiencing ventricular tachycardia. He 
knew that giving Verapamil to a person experiencing ventricular tachycardia 
could be a lethal error. Johansen testified that, as a paramedic working as an 
employee in the Medical Center’s emergency room, the order for Verapamil 
raised a question in his mind as to whether the medication was appropriate for 
Scott. While he was filling the syringe with Verapamil, he had a serious 
question about the propriety of this medication for Scott. Johansen testified 
that he and Nurse Crain looked at each other, “still like unsure, like are we 
giving Verapamil.” Nurse Crain then nodded her head to Johansen, and he 
interpreted this nod as an indication that he was to go ahead and inject the 
Verapamil. Even while he was injecting the Verapamil, Johansen still had a 
serious question about the propriety of giving Verapamil. Johansen testified:
Q. 
Well, to you with your level of training, your level of knowledge, your level of 
familiarity with the ACLS materials, to you the Verapamil was clearly 
contraindicated to be given to Scott Bush, correct?
 
A. 
Yes, sir.
 
Q. 
But you still gave it to him.
 
A. 
Yes, sir.
        Finally, 
Dr. Zeh, the emergency room physician who ordered Verapamil for Scott, swore 
that during her phone consultation with the on-call cardiologist, Dr. Osborne, 
he told her to administer five milligrams of Verapamil to Scott because 
Scott’s last EKG showed a “left bundle branch block” that would not 
“break” without Verapamil. Dr. Zeh explained that she was ACLS certified and 
that she also had gone through her emergency room board certification a year and 
a half before Scott came into the emergency room that night. She agreed that she 
knew Verapamil was generally contraindicated for persons experiencing 
ventricular tachycardia, but said that Scott was considered outside the ACLS 
guidelines because he had been nonresponsive to lidocaine and Bretylium; he was 
on Tambocor; and he had undergone a surgical procedure a few years earlier, an 
ablation, that was unsuccessful in eliminating his recurrent ventricular 
tachycardia.
        Dr. 
Zeh testified:
Q. 
So just to make sure I am clear: Did you have an opinion at that time as to 
whether or not the order for Verapamil was, in your judgment, in his best 
interest?
 
A. 
The medications I had given to Mr. Bush prior to the Verapamil had not had the 
desired effect. And this was my next step that was recommended to me by my 
cardiologist. And I felt - - again, I felt comfortable enough with my consultant 
to go ahead and not question it and give that medicine. I am not sure I am . . . 
.
 
Q. 
Would you have given it, yourself?
 
A. 
I did not give it myself, no.
 
Q. 
Would you have?
 
A. 
No, sir.

        Dr. 
Zeh also testified that neither Nurse Crain or Johansen questioned her order for 
Verapamil. She testified that both the nursing and paramedic standards of care 
require that if a nurse or a paramedic has a serious question about the 
propriety of a particular medication ordered by a doctor, they should not 
participate in the carrying out of that order until their question is addressed. 
Dr. Zeh testified that she expected and wanted a nurse or a paramedic who had a 
serious question about one of her orders to bring it to her attention, and if 
the question was serious enough, to refuse to participate in carrying out the 
order. Dr. Zeh testified that Nurse Heskes, Nurse Crain, and Johansen all failed 
to do that in this case.
        Every 
person in Scott’s treatment room—Nurse Crain, Johansen, Nurse Heskes, and 
Dr. Zeh—agreed that Scott was “hemodynamically stable” before he received 
the Verapamil. That is, Scott’s blood pressure was fine, he was conscious, he 
was talking, he was experiencing no pain, and he was not experiencing nausea or 
clamminess. Johansen injected Verapamil into Scott at 11:35 p.m. Within two 
minutes, Scott’s blood pressure had dropped, his skin color was pale, and he 
began convulsing. The next entry in Scott’s medical record shows that by 11:45 
p.m. he was in complete cardiac arrest—was not breathing and had no 
pulse—and was being “bagged” with an Ambu bag. Finally, sometime after 
midnight, records document a pulse for Scott, and at 12:28 p.m., he was 
transferred to the Medical Center’s intensive care unit.
        Dr. 
Osborne, the on-call cardiologist who spoke with Dr. Zeh, testified that on 
January 19, 2000, he was driving home from the Medical Center when Dr. Zeh paged 
him. He returned the page and spoke with Dr. Zeh. Dr. Zeh told him that Scott 
was in the emergency room and was experiencing ventricular tachycardia, but was 
hemodynamically stable. Dr. Osborne said that he did not indicate anything 
specific to Dr. Zeh at the conclusion of the conversation, but decided to turn 
around and head back to the Medical Center. Approximately ten to fifteen minutes 
after the first page, Dr. Zeh again paged Dr. Osborne. In this conversation, she 
asked for an explanation of why Scott’s heart would not convert to a normal 
rhythm, despite the administration of lidocaine and Bretylium. In response to 
Dr. Zeh’s question, Dr. Osborne explained that:
[T]here 
are forms of ventricular tachycardias that don’t respond to medications 
necessarily like lidocaine or Bretylium, and that these tachycardias can 
sometimes be seen more in younger people, people with what we call structurally 
normal hearts, that is, they’ve never had a heart attack or heart failure or 
fluid on the lungs or what we call cardiomyopathy, any prior damage to the 
heart, the heart as far as we can tell is normal, and that these kind of 
tachycardias don’t typically respond to medications like lidocaine and 
Bretylium because they have different mechanisms by which they cause the 
ventricular tachycardia.

        Dr. 
Osborne also mentioned that some of these types of ventricular tachycardias that 
may exist in young people with structurally normal hearts may be classified as 
Verapamil-sensitive tachycardias. Dr. Osborne provided this information to Dr. 
Zeh to “help to enlighten her as far as possibilities that may be existing 
that could explain what she’s seeing.” He concluded the conversation by 
confirming that Scott remained hemodynamically stable and by telling Dr. Zeh to 
“sit tight and I’ll be there shortly.” Dr. Osborne said that he did not 
order Verapamil for Scott and that nothing he said to Dr. Zeh was intended to 
convey that Verapamil should be given to Scott. Dr. Osborne said he would not 
have ordered Verapamil for Scott if he had been in the emergency room.
        Dr. 
Osborne testified that the Verapamil caused Scott’s blood pressure to fall, 
the fall in blood pressure caused an anoxic arrest, and the anoxic arrest led to 
Scott’s hypoxic brain injury. He then testified:
Q. 
You, you told us just a little while ago that it’s probable, more likely than 
not, that the Verapamil started the events leading to the hypoxic brain injury, 
correct?
 
A. 
That’s correct.

He 
further testified:
 
Q. 
You indicated that he had severe anoxic encephalopathy. Would you explain to the 
jury what that is?
 
A. 
Essentially it just means brain damage due to lack of blood flow to the brain.
 
Q. 
What you have –
 
A. 
Or lack of oxygen to the brain.
 
Q. 
What you have already described as starting with the events caused by the 
Verapamil?
 
A. 
Yes.

                . 
. . .
 
Q. 
In all reasonable medical probability, if Scott had not been given Verapamil, in 
all likelihood, he’d be leading a normal life today, wouldn’t he?
 
A. 
I -- honestly I don’t know. I -- it’s possible.
 
Q. 
Well, it’s more likely than not, isn’t it, given the information that we 
know and with what you’ve already told us regarding the Verapamil, isn’t it 
more likely than not?
 
A. 
I think that’s probably the case.
 
Q. 
Scott didn’t cause his own brain damage, did he?
 
A. 
No.
 
Q. 
Those who allowed Verapamil to be administered to him started the series of 
events that led and caused his brain damage, correct?
 
A. 
I would say I’d agree with that.

Still 
later Dr. Osborne testified:
 
Q. 
. . . . None of the answers you gave to the hospital lawyer changes your sworn 
testimony to the jury in this case about what you said earlier today that 
Verapamil should have never been given to Scott Bush, correct?
 
A. 
That’s correct.
 
Q. 
And none of the answers that you gave to the hospital lawyer, changes your sworn 
testimony to these people that in all likelihood, if Verapamil had never been 
given to Scott Bush, he would probably be leading a normal life today, correct?
 
A. 
That’s correct.
        Jan 
Winter (“Winter”) was employed by the Medical Center as a nurse manager when 
Scott came to the emergency room. In the Medical Center’s hierarchy, a nurse 
manager is above the charge nurse, but below the House Supervisor. Part of 
Winter’s job duties as a nurse manager required her to be available on-call in 
case hospital staff, such as a nurse like Crain or a paramedic like Johansen, 
had questions. Winter had authority and supervisory control over the nurses and 
hospital personnel working under her, including Nurse Crain and Johansen. She 
explained that both nurses and paramedics have their own nursing and paramedic 
standards of care; they cannot just blindly follow a doctor’s order. She 
testified that the standard of care for both nurses and paramedics is to refuse 
to administer medication if they have a serious, unanswered question about the 
propriety of a medication. She testified:
Q. 
. . . If a nurse and a paramedic still admit that they have a serious question, 
knowing that there is an extreme degree of risk that’s likely to cause 
potential harm and injury to the patient, wouldn’t you agree that they should 
not participate in the administration of the medication as long as that serious 
question remains, knowing that there is an extreme risk that their conduct is 
going to result in harm to the patient in all likelihood; wouldn’t you agree 
they should not participate?
 
A. 
If they have a serious question, they should not participate.
 
Q. 
And if they do, it is a breach of their standard of care, isn’t it?
 
A. 
Yes, I believe so.

        Winter 
was shown Nurse Crain’s and Johansen’s trial testimony that both of them, 
although they each had a serious question about the propriety of Verapamil for 
Scott and knew that this drug posed an extreme degree of risk to him, 
nonetheless chose to do nothing to prevent or to delay the administration of the 
drug. After reviewing this testimony, Winter agreed that, based on the questions 
and answers, both Nurse Crain and Johansen “knew better, but did it anyway.”
        Lane 
Looka (“Looka”), a registered nurse paramedic, testified that he had 
reviewed the Medical Center’s policies and procedures, as well as the sworn 
testimony of Nurse Crain, Johansen, Dr. Osborne, Nurse Heskes, Dr. Zachariah, 
and others. Looka explained that, under the job description provided to 
Johansen, Johansen was functioning in the Medical Center’s emergency room as a 
paramedic nurse tech and was not authorized to administer medicines at all:
A. 
. . . Eric Johansen, if you refer back to that job description, it does not 
indicate as a paramedic nurse tech that they are allowed to give any medications 
whatsoever. The official job description of Eric Johansen was the one that was 
shown just then and there’s no mention of him being able to give any kind of 
medications at all in the emergency department.
 
Q. 
And were you also shown what we have now marked as Exhibit 19, which are 
Procedures Performed by Nonphysicians, including paramedics at Columbia Las 
Colinas Medical Center?
 
A. 
Yes.
 
Q. 
And if we look at Item B on the second page under Paramedics, would you tell us 
whether any of the items would allow Eric Johansen to be administering Verapamil 
to Scott Bush?
 
A. 
No, they do not.
 
Q. 
I would like to note also that Mr. Johansen not only administered Verapamil but 
he did administer the lidocaine and Bretylium as well prior to that. Was he 
allowed to do that, in your opinion?
 
A. 
He was not allowed to do those either.

        Looka 
was provided with the legal definitions of negligence and ordinary care and 
opined that Nurse Crain and Johansen were both negligent in participating in the 
administration of Verapamil to Scott. Looka was also provided with the legal 
definition of malice and opined that Nurse Crain’s and Johansen’s conduct 
fell within the legal definition of malice. Looka testified:
Q. 
Would you tell the jury why the conduct of Lisa Crain and Eric Johansen in your 
opinion falls under this definition of malice that we have gone over?
 
A. 
Basically, Lisa Crain, Eric Johansen both knowingly, consciously knew that 
there’s significant risk and potential harm of giving Mr. Bush the Verapamil. 
They had numerous things in place that they could have done to stop it, postpone 
it. They could have not given it and not even put themselves in this situation. 
But they chose not to. They ignored it. They ignored the chain of command and 
went ahead, and knowing that Verapamil posed great risk and side effects to Mr. 
Bush, they gave it anyway.

According 
to Looka, “Lisa Crain and Eric Johansen should have caught that error [the 
order for Verapamil] and should not have given medication.”
        Dr. 
Zachariah testified that Scott’s emergency room department records show that 
Scott’s chief complaint was ventricular tachycardia. He agreed that Verapamil 
is contraindicated for patients suffering ventricular tachycardia. Assuming a 
patient presents with the same symptoms as Scott, Verapamil is not the correct 
medicine to give.
        Dr. 
Peter Bastone (“Bastone”), president and chief executive officer for Mission 
Hospital Regional Medical Center in Mission Viejo, California, testified that 
the Medical Center was negligent in several respects, including by failing to 
have a job description for paramedics like Johansen. He said that the failure to 
have job descriptions creates an “extraordinary exposure in terms of something 
actually going wrong or something being delegated or given to an individual who 
may not have the competency to follow through or may end up being an atoward 
[sic] outcome in regards to that.” Dr. Bastone was provided with the 
definition of malice and testified that in his opinion the Medical Center’s 
conduct—including its failure to have a job description for Johansen more than 
eight months after he started working in the emergency room and despite 
Johansen’s questions regarding his duties—fell within the legal definition 
of malice.
        Dr. 
Lawrence Hum (“Hum”), an emergency medicine physician, testified that the 
ACLS manual simply sets forth guidelines. These guidelines may be deviated from 
whenever necessary to promote the best interest of the patient. According to Dr. 
Hum, Verapamil is not contraindicated for all patients suffering ventricular 
tachycardia, but only for older patients with clogged arteries who have 
ventricular tachycardia. He said Verapamil was not contraindicated for Scott. 
Dr. Lawrence also testified that the nursing and paramedic standard of care 
simply require a nurse and a paramedic to follow the doctor’s order and that 
Nurse Crain and Johansen met or exceeded that standard here.
        Judy 
Selfridge-Thomas, an emergency room nurse, testified that it was outside the 
scope of an emergency room nurse’s abilities to diagnose a “left bundle 
branch block” on an EKG. She testified that the ACLS manual sets forth only 
guidelines and that any specific case may deviate from these suggested 
guidelines. She opined that Nurse Crain and Johansen met the standard of care by 
administering Verapamil to Scott.
        Dr. 
Theodore Chan (“Dr. Chan”), an emergency room doctor, testified that an 
emergency room doctor like Dr. Zeh is responsible for the medicines he or she 
orders. No matter how many consultations the emergency room doctor receives, 
ultimately, the emergency room doctor is responsible for the medicines she 
orders. According to Dr. Chan, Dr. Zeh was negligent in ordering Verapamil, and 
Dr. Zeh’s negligence proximately caused the occurrence in question.
        Dr. 
Jay Schapira, a cardiologist, testified that under the facts presented by 
Scott’s case, the standard of care requires a cardiologist to advise an 
emergency room doctor not to administer Verapamil to a person in Scott’s 
condition. He swore that Dr. Osborne violated the standard of care by failing to 
advise Dr. Zeh not to administer Verapamil and that Dr. Osborne’s negligence 
proximately caused the occurrence here.
        Dr. 
David Allen Schwartz (“Dr. Schwartz”), a cardiologist, testified that 
Verapamil was an appropriate medication for Scott. Dr. Schwartz testified that 
based on Scott’s medical records from years earlier, when Scott was first 
diagnosed with ventricular tachycardia and the results of a cardiac 
electrophysiology study conducted near that time, he could tell that Scott had a 
“focal site of the tachycardia or the rhythm disturbance to arise from part of 
the left ventricle.” Dr. Schwartz explained:
The 
left ventricle is the major pumping chamber of the heart. It pumps the blood to 
the brain and the rest of the body and it’s--and typically--and it’s located 
in a specific section that puts--puts it into a category that we call idiopathic 
left ventricular tachycardia.

                . 
. . .
 
And 
the important point for this and the important point, I think as it relates to 
this situation, is that it is Verapamil-sensitive.

Dr. 
Schwartz reviewed Scott’s January 19, 2000 EKGs from the Medical Center and 
said one showed an “aberrant right bundle branch block with a left anterior 
hemi-block pattern or a--certainly a--which again tells you that it’s arising 
from the same place that the other tachycardia was arising.” Finally, Dr. 
Schwartz testified:
Q. 
. . . For a patient in Scott Bush’s condition, understanding the history that 
we have discussed from East Texas Medical Center and Presbyterian, understanding 
the EKGs from 1998 and the one that you saw that evening, and understanding your 
review of the records, with his particular heart condition, would Verapamil be a 
reasonable or an appropriate medication?
 
A. 
The answer to the question is, yes. And I believe I have stated that in my 
expert report.
 
Q. 
Why?
 
A. 
This is a one -- this -- this is certainly the only ventricular tachycardia that 
is effectively responsive to Verapamil. And identifying this particular 
tachycardia as being idiopathic left ventricular tachycardia, makes it a 
Verapamil-sensitive tachycardia. And you have tried a couple of other 
medications prior to this time that I am sure that -- that revert most cases of 
tachycardia, ventricular tachycardia, and they were not successful. So--
        C. 
Proximate Cause Evidence is Legally and Factually Sufficient
        Plaintiffs 
in medical negligence cases are required to prove by a preponderance of the 
evidence that the allegedly negligent act or omission was a proximate cause of 
the harm alleged. See Kramer v. Lewisville Mem'l Hosp., 858 S.W.2d 397, 
400 (Tex. 1993). To establish proximate cause, the plaintiff must prove (1) 
foreseeability and (2) cause-in-fact. Leitch, 935 S.W.2d at 118-19. The 
ultimate standard of proof on the causation issue "is whether, by a 
preponderance of the evidence, the negligent act or omission is shown to be a 
substantial factor in bringing about the harm and without which the harm would 
not have occurred." Park Place Hosp. v. Estate of Milo, 909 S.W.2d 
508, 511 (Tex. 1995); see Arguelles v. U.T. Family Med. Ctr., 941 S.W.2d 
255, 258 (Tex. App.—Corpus Christi 1996, no writ). The precise words of 
"reasonable medical probability" are not essential, but evidence of 
causation must still rise above mere conjecture or possibility. See Duff v. 
Yelin, 751 S.W.2d 175, 176 (Tex. 1988); Brownsville Pediatric Ass'n v. 
Reyes, 68 S.W.3d 184, 189 (Tex. App.—Corpus Christi 2002, no pet.). The 
trier of fact may decide the issue of proximate cause in medical malpractice 
cases based upon: (1) general experience and common sense from which reasonable 
persons can determine causation; (2) scientific principles provided by expert 
testimony allowing the fact finder to establish a traceable chain of causation 
from the condition back to the event; or (3) a probable causal relationship as 
articulated by expert testimony. Marvelli v. Alston, 100 S.W.3d 460, 470 
(Tex. App.—Fort Worth 2003, pet. denied) (citing Parker v. Employers Mut. 
Liab. Ins. Co. of Wis., 440 S.W.2d 43, 46 (Tex. 1969)).
        1. Legal Sufficiency
        The 
evidence here conclusively established that Scott was experiencing ventricular 
tachycardia. No evidence to the contrary exists. The evidence here likewise 
conclusively established that Scott was hemodynamically stable prior to the 
administration of Verapamil. Scott’s blood pressure did not drop following the 
administration of lidocaine or Bretylium. The ACLS manual and the Verapamil 
package insert both warn that Verapamil should not be administered to a patient 
experiencing ventricular tachycardia because the drug can cause “marked 
hemodynamic deterioration,” which in layman’s terms is a bottoming out of 
blood pressure. All of the medical experts testified, and Scott’s medical 
records demonstrate, that is exactly what happened to him two minutes after he 
received Verapamil.
        Additionally, 
Dr. Osborne testified that Scott’s hemodynamic deterioration within two 
minutes of the administration of Verapamil is the “time frame that you would 
expect the effects of Verapamil to start taking place;” it is “the right 
temporal relationship” to have been caused by the administration of Verapamil. 
Osborne repeatedly testified that Verapamil started the sequence of events 
leading to Scott’s brain injury. Further, Dr. Zeh testified that she would not 
have administered the Verapamil herself, leaving the jury free to infer that if 
the medical personnel in Scott’s room had voiced their serious concerns about 
the propriety of the administration of Verapamil or had refused to participate 
in the administration of Verapamil to Scott, the drug would not have been given.
        Considering 
only the evidence and inferences supporting the jury’s proximate cause finding 
and disregarding all evidence and inferences to the contrary, more than a 
scintilla of evidence exists that Scott’s injury was foreseeable. Nurse Crain, 
Johansen, and Nurse Heskes, as well as several experts, all testified that they 
knew prior to the administration of Verapamil that the drug posed an extreme 
risk of harm to Scott, i.e., that a risk of injury or death was foreseeable. 
Likewise, considering only the evidence and inferences supporting the jury’s 
proximate cause finding and disregarding all evidence and inferences to the 
contrary, more than a scintilla of evidence exists that the administration of 
Verapamil was a cause in fact of Scott’s injury. The trier of fact was free to 
determine based upon general experience and common sense that because Scott was 
sitting, talking, in no pain, and experiencing no nausea or clamminess until he 
was injected with Verapamil—which according to the package insert, the ACLS 
manual, and expert testimony should not have been given to him—and because two 
minutes after the administration of Verapamil Scott suffered the exact 
disastrous consequence warned against, the Verapamil caused the disastrous 
consequence.
        Likewise, 
scientific principles provided by Dr. Osborne establish a traceable chain of 
causation from the condition—Scott’s brain damage—back to the event—the 
administration of Verapamil. Dr. Osborne testified that the Verapamil caused 
Scott’s blood pressure to fall, the fall in blood pressure caused an anoxic 
arrest, and the anoxic arrest led to Scott’s hypoxic brain injury. Finally, 
Dr. Osborne opined that but for the administration of Verapamil, Scott would 
probably be leading a normal life today. We hold that the evidence is legally 
sufficient to support the jury’s finding that Appellants’ negligence 
proximately caused Scott’s injury.
        2. Factual Sufficiency
        Likewise, 
viewing all of the evidence, the evidence supporting the jury’s answers to 
special question 1 is not so weak, nor is the evidence to the contrary so 
overwhelming, that the jury’s answer should be set aside and a new trial 
ordered. See Garza, 395 S.W.2d at 823. Indeed, Appellants do not point to 
specific evidence as constituting overwhelming contrary evidence concerning 
proximate cause. Instead, without a factual sufficiency analysis, in one 
sentence Appellants simply assert that the evidence supporting the jury’s 
proximate cause finding is so weak that this court should reverse and remand for 
a new trial. We have carefully reviewed the entire record in detail, and we hold 
that the evidence supporting the jury’s answers to special question 1 is not 
so weak nor the contrary evidence so overwhelming that a new trial is required. 
We overrule Appellants’ first issue.
 
        D. Evidence of Malice is Legally and Factually 
Sufficient
        In 
their third issue, Appellants contend that the evidence is legally and factually 
insufficient to support the jury’s malice finding against the Medical Center. 
Specifically, the Medical Center claims that there is insufficient evidence to 
establish the objective element of malice and that no evidence exists that a 
vice principal of the Medical Center was subjectively aware of or consciously 
indifferent to the risk of injury to Scott.
        Generally, 
the definition of malice under section 41.001(7)(B) consists of two components: 
one objective, one subjective. Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 
13.02, sec. 41.001(7)(B)(i), 2003 Tex. Gen. Laws 887, 887 (amended 2003) 
(current version at Tex. Code Crim. Proc. 
Ann. art. 41.001(7) (Vernon Supp. 2004)); see also Wal-Mart Stores, 
Inc. v. Alexander, 868 S.W.2d 322, 325-26 (Tex. 1993). Objectively, the 
defendant's conduct must involve an extreme risk of harm, a significantly higher 
threshold than the objective reasonable person test for negligence. Transp. 
Ins. Co. v. Moriel, 879 S.W.2d 10, 22 (Tex.1994). Subjectively, the 
defendant must have actual awareness of the extreme risk created by the conduct. 
Id. Evidence of simple negligence is not enough to prove either the 
objective or subjective components of malice. See Mobil Oil Corp. v. Ellender, 
968 S.W.2d 917, 921 (Tex. 1998).
        The 
objective malice prong is a function of both the magnitude and the probability 
of the potential injury and is not satisfied if the defendant's conduct merely 
creates a remote possibility of serious injury. Universal Servs. Co. v. Ung, 
904 S.W.2d 638, 641 (Tex. 1995). To satisfy the objective malice prong, the 
defendant's conduct must, viewed objectively from the actor's standpoint, 
involve an extreme degree of risk. Lee Lewis Constr., Inc. v. Harrison, 
70 S.W.3d 778, 785 (Tex. 2001). “Extreme risk” means not a remote 
possibility of injury or even a high probability of minor harm, but rather the 
likelihood of serious injury to the plaintiff. Id. Circumstantial 
evidence is sufficient to prove either element of malice. Id.; Ellender, 
968 S.W.2d at 921; Moriel, 879 S.W.2d at 22-23.
        A 
corporation is liable for punitive damages if it authorizes or ratifies an 
agent's gross negligence or if it commits gross negligence through the actions 
or inactions of a vice principal. Ellender, 968 S.W.2d at 921-22; Hammerly 
Oaks, Inc. v. Edwards, 958 S.W.2d 387, 389 (Tex. 1997). “Vice principal” 
encompasses: (a) corporate officers; (b) those who have authority to employ, 
direct, and discharge servants of the master; (c) those engaged in the 
performance of nondelegable or absolute duties of the master; and (d) those to 
whom the master has confided the management of the whole or a department or a 
division of the business. Hammerly Oaks, 958 S.W.2d at 391.
        1. Legal Sufficiency
        Considering 
all the evidence in the light most favorable to the jury’s malice finding, we 
hold that sufficient evidence exists from which a reasonable trier of fact could 
have formed a firm belief or conviction that, viewed from Nurse Crain’s,[7] Johansen’s, and Nurse Heskes’s standpoint, the 
administration of Verapamil involved an extreme degree of risk to Scott. In 
fact, all three testified that they knew and understood from the express 
warnings in the ACLS manual that the administration of Verapamil to a person who 
was experiencing ventricular tachycardia, like Scott, could have “lethal,” 
“disastrous” consequences. The magnitude of the injury (i.e. death) and the 
probability of that injury—probable enough to warrant a specific ACLS 
tachycardia algorithm “carefully constructed to restrict the use of Verapamil 
to only patients with narrow-complex PSVT with normal or elevated blood 
pressure”—demonstrates that the administration of Verapamil to Scott posed 
an extreme degree of risk. See Lee Lewis, 70 S.W.3d at 785; Kroger, 
113 S.W.3d at 601.
        Citing 
Louisiana-Pacific Corp. v. Andrade, the Medical Center next argues that 
no evidence exists that a vice principal of the Medical Center was subjectively 
aware of or consciously indifferent to the risk of injury to Scott. 19 S.W.3d 
245 (Tex. 1999). The second malice element, “actual awareness,” means that 
the defendant knew about the peril, but its acts or omissions demonstrated that 
it did not care. Lee Lewis, 70 S.W.3d at 785. Again, circumstantial 
evidence is sufficient to prove this element. Id.
        The 
court’s charge provided the jury with the Hammerly Oaks four-pronged 
definition of a vice principal. The evidence showed that Nurse Heskes, the House 
Supervisor, was part of the hospital management, was responsible for supervising 
the nursing units and ancillary departments, and was the top nurse in the entire 
Medical Center. Thus, she met the charge’s definition of vice principal. See, 
e.g., Texarkana Mem’l Hosp., Inc. v. Firth, 746 S.W.2d 494, 496-98 (Tex. 
App.—Texarkana 1988, no writ). Nurse Heskes testified that she was present in 
Scott’s treatment room when he received Verapamil. Nurse Heskes testified that 
she had a serious question about the propriety of administering Verapamil, and 
knew that Nurse Crain and Johansen did, too; yet she did nothing:
Q. 
And not only did you have a serious question about an extreme degree of 
potential harm this was going to cause Scott, and not only did you know that two 
people under you, another nurse and a paramedic had a serious question about an 
extreme degree of risk that could lead to serious and potential harm to Scott, 
but, in additional to all of that, you allowed a paramedic to inject a cardiac 
medication when you knew that he was really not authorized to do so, didn’t 
you?
 
A. 
That’s correct.

Nurse 
Heskes testified that she had a duty to intervene to prevent the administration 
of Verapamil, but that she did not intervene and that she may have breached her 
duty to intervene. This evidence is such that a fact finder could reasonably 
form a firm belief or conviction about the truth of the matter required to be 
established by clear and convincing evidence: that a vice principal of the 
Medical Center objectively recognized that the administration of Verapamil to 
Scott involved an extreme risk of harm and subjectively had actual awareness of 
this extreme risk, but nonetheless chose to breach her duty to intervene to 
prevent the harm or, alternatively, ratified the conduct despite the extreme 
risk of harm by failing to intervene. See J.F.C., 96 S.W.3d at 
265-66.
        The 
present facts are not analogous to the Andrade facts, where the plaintiff 
was injured when he touched an electrified crane rail. 19 S.W.3d at 246-47. In Andrade, 
the corporate managers all subjectively thought that the crane had been 
“locked out,” i.e., that the electrical power to the crane had been shut 
off. Id. at 248. Thus, the supreme court explained that there was not 
legally sufficient evidence that corporate personnel knew the crane was 
energized and nevertheless did not care whether workers would encounter that 
risk. Id. Here, every person in Scott’s treatment room, except Scott 
himself, testified that they knew the administration of Verapamil to Scott posed 
an extreme degree of risk and that they nonetheless participated in or failed to 
intervene in the administration of Verapamil. Unlike the facts in Andrade, 
there was no question here that Johansen and Nurse Heskes knew with certainty as 
Scott was being injected that he would encounter the risks posed by Verapamil. 
We hold that the evidence, viewed in the light most favorable to the jury’s 
malice finding, is sufficient to permit a reasonable trier of fact to form a 
firm conviction or belief that the harm to Scott resulted from the Medical 
Center’s malice. See J.F.C., 96 S.W.3d at 266.
        2. Factual Sufficiency
        We 
next consider whether, giving due consideration to the evidence the jury could 
reasonably have found to be clear and convincing evidence of malice, based on 
the entire record, the jury could reasonably form a firm conviction or belief 
regarding the Medical Center’s malice. See C.H., 89 S.W.3d at 25. We 
review the entire record to determine whether the disputed evidence that a 
reasonable fact finder could not have credited in favor of the finding is so 
significant that the jury could not have reasonably formed a firm conviction or 
belief concerning malice by the Medical Center. See id. The Medical 
Center identifies particular evidence as contrary to the jury’s malice 
finding. First, the Medical Center points to testimony that Nurse Crain, 
Johansen, and Nurse Heskes all relied upon “doctors that we trusted” in 
administering Verapamil to Scott negated the jury’s malice finding. Each of 
these medical professionals, however, testified themselves that the nursing and 
paramedic standards of care required them to exercise their independent medical 
judgment, not to just blindly follow a doctor’s order that they knew posed an 
extreme degree of risk to a patient. They all testified that Verapamil posed an 
extreme degree of risk to Scott and that they had a serious question about the 
propriety of Verapamil for him. Yet, Nurse Crain and Johansen admitted that they 
not only failed to intervene to prevent the administration of the drug to Scott 
but also participated in its administration. Nurse Heskes admitted that the 
standard of care required her to intervene in the administration of Verapamil 
and that she did not. Thus, in light of Nurse Crain’s, Johansen’s, and Nurse 
Heskes’s admitted, independent duties to Scott under the applicable standards 
of care, the contention that they all “trusted the doctors” does not weigh 
very heavily, if at all, against the jury’s malice finding.
        The 
Medical Center also points to Johansen’s testimony that he felt very badly 
about what happened to Scott. The Medical Center cites no case law, and our 
research has revealed no authority, supporting the contention that 
after-the-fact remorse excuses, or weighs against, a finding that at the time of 
the occurrence a defendant acted with malice. We hold that evidence of remorse 
does not weigh against the jury’s malice finding although it may be considered 
by the jury in determining the amount of punitive damages award. See 
Ellis County State Bank v. Keever, 936 S.W.2d 683, 686 (Tex. App.—Dallas 
1996, no writ) (recognizing remorse is factor in reviewing sufficiency of 
evidence supporting amount of punitive damage award).
        Finally, 
the Medical Center points to Dr. Hum’s testimony that the administration of 
Verapamil to Scott was appropriate. Dr. Hum’s opinion that Verapamil was a 
proper medication for Scott is greatly outweighed by expert testimony, some of 
it from defense experts, that Verapamil was contraindicated for Scott. Nurse 
Crain, Johansen, Nurse Heskes, Dr. Osborne, Looka, Dr. Zachariah, and Dr. Chan 
all testified that Verapamil was contraindicated for Scott. Additionally, the 
documentary evidence—the ACLS manual and the Verapamil package 
insert—likewise establish that Verapamil was contraindicated for Scott.
        The 
disputed evidence that the jury could not have credited in favor of its malice 
finding is not substantial. Based on the record as a whole, especially in view 
of the quantity of evidence supporting the jury’s malice finding, the contrary 
evidence is simply not so significant that a fact finder could not have 
reasonably formed a firm conviction or belief concerning malice. C.H., 89 
S.W.3d at 25; Kroger, 113 S.W.3d at 601. Moreover, evidence of “some 
care” does not insulate a defendant from gross negligence liability. Ellender, 
968 S.W.2d at 924. Consequently, based on the entire record, the jury could 
reasonably have formed a firm conviction or belief that, despite Dr. Zeh’s 
order for Verapamil, Johansen and Nurse Heskes objectively recognized that the 
administration of Verapamil to Scott involved an extreme risk of harm and 
subjectively had actual awareness of this extreme risk, but nonetheless chose to 
participate in or fail to intervene in the administration of the drug, and in 
Nurse Heskes’s case, ratified the administration of Verapamil by Johansen. See 
C.H., 89 S.W.3d at 25. We overrule Appellants’ third issue.
IV. Alleged 
Charge Error
        In 
their second issue, Appellants appear to argue that charge error occurred 
because some of the specific negligent acts pleaded by Scott within his 
negligence cause of action were supported by no evidence.[8]  
Appellants contend, therefore, that the trial court erred by refusing to submit 
limiting instructions along with its broad-form negligence submission, telling 
the jury not to consider those specific acts of negligence. For example, the 
Medical Center requested that an instruction be submitted with the negligence 
question stating, “In considering the negligence of Las Colinas Medical 
Center, you should not consider the negligence, if any, of Las Colinas Medical 
Center in failing to have appropriate job descriptions for its employees.” The 
Medical Center also requested other instructions such as, “In considering the 
negligence of Las Colinas Medical Center, you should not consider the delay, if 
any, in providing treatment to Scott Bush.” The trial court refused to submit 
any of the limiting instructions requested by the Medical Center in connection 
with the broad-form negligence special question.[9]
        The 
broad-form negligence special question submitted in this case simply does not 
present Casteel/Harris County error. In Casteel, the court’s 
charge submitted five distinct DTPA-based theories of liability, along with 
eight other theories of liability, in a single broad-form question. 22 S.W.3d at 
388. Because the plaintiff in Casteel lacked standing to assert four of 
the five DTPA theories, the trial court erred by submitting those theories to 
the jury. Id. The supreme court held that this error was harmful because 
the court of appeals could not determine whether the jury based its verdict on 
an improperly submitted invalid theory or on a properly submitted valid theory. Id.
        Here, 
Scott pleaded one theory of liability against Nurse Crain and one theory of 
liability against the Medical Center: negligence. Within his negligence 
pleading, Scott additionally pleaded specific negligent acts by Nurse Crain and 
by the Medical Center. But these acts are not separate theories of liability and 
do not constitute the assertion by Scott of any additional basis for recovery. See 
id. at 390 (recognizing that broad-form submission may not be feasible when 
there are alternative liability standards and the governing law is 
unsettled or when the trial court is unsure whether it should submit a 
particular theory of liability); Crawford v. Deets, 828 S.W.2d 
795, 799-800 (Tex. App.—Fort Worth 1992, writ denied). Moreover, even if the 
specific acts of negligence alleged might be considered separate “theories of 
liability,” in this case, unlike in Casteel, no valid theories of 
recovery were commingled in a listing with invalid theories of recovery in the 
broad-form question; thus, no charge error occurred. See Excel v. Apodaca, 
51 S.W.3d 686, 700 (Tex. App.—Amarillo 2001) (holding Casteel does not apply 
to broad-form negligence question), rev’d on other grounds, 81 S.W.3d 
817 (Tex. 2002). The charge here properly submitted one theory of liability and 
recovery—negligence—in a single broad-form question. Tex. R. Civ. P. 277; Crawford, 828 S.W.2d at 
799-800.
        Nor 
is the present case like Harris County. In Harris County, the 
trial court erroneously, over objection, instructed the jury in making a 
lump-sum damage award to consider a specific element of damages on which no 
evidence was presented. 96 S.W.3d at 231. Here, the trial court did not instruct 
the jury to consider or to not consider any specific act of negligence. The 
trial court simply provided the jury with the definitions of negligence, 
ordinary care, and proximate cause as to each of the defendants and asked, 
“Did the negligence, if any, of those named below proximately cause the 
occurrence in question?” See 3 Comm. 
on Pattern Jury Charges of the State Bar of Tex., Texas Pattern Jury Charges 
§ 51.3 (2002). Thus, the Harris County charge error is not present in 
this case.
        Appellants 
have not cited, nor has our research revealed, any case holding that limiting 
instructions concerning pleaded, alternative, allegedly negligent acts are 
required to properly submit a single negligence liability theory. Cf. Lemos 
v. Montez, 680 S.W.2d 798, 801 (Tex. 1984) (disavowing the proliferation of 
jury instructions in favor of simplicity in jury charges); Excel, 51 
S.W.3d at 700 (refusing to apply Casteel analysis to broad-form 
negligence special question); Crawford, 828 S.W.2d at 799-800 (holding 
trial court correctly submitted broad-form negligence question in medical 
negligence case and did not abuse its discretion by refusing to submit 
instructions concerning specific pleaded acts of negligence). Submission of such 
instructions would be contrary to the Texas Supreme Court’s pronouncement in Lemos:
We 
have learned from history that the growth and proliferation of both instructions 
and issues come one sentence at a time. For every thrust by the plaintiff for an 
instruction or an issue, there comes a parry by the defendant. Once begun, the 
instructive aids and balancing issues multiply. Judicial history teaches that 
broad issues and accepted definitions suffice and that a workable jury system 
demands strict adherence to simplicity in jury charges.

680 
S.W.2d at 801. Such a holding would likewise be contrary to the Texas Supreme 
Court’s express warning in Harris County that “[n]either our decision 
today nor Casteel is a retrenchment from our fundamental commitment to 
broad-form submission.” Harris County, 96 S.W.3d at 235. We decline to 
expand the supreme court’s holdings in Casteel and Harris County 
by applying them to require submission of limiting instructions concerning 
specific pleaded negligent acts within a single broad-form submission of a 
negligence theory of liability.
        Also 
in their second issue, Appellants assert that a Casteel/Harris County 
charge error exists concerning the trial court’s submission of malice. 
Specifically, Appellants claim that the trial court instructed the jury on two 
different theories whereby malice could be attributed to the Medical Center: 
acts with malice by a vice principal or ratification by a vice principal of the 
acts taken with malice. The Medical Center claims no evidence exists to support 
submission of the ratification theory for imputing malice and that, 
consequently, its submission created Casteel/Harris County charge error.
        Based 
on our review of the record, legally sufficient evidence exists that Nurse 
Heskes ratified the administration of Verapamil to Scott by Johansen. Nurse 
Heskes admitted that she supervised Johansen, that she knew he had a serious 
question about the propriety of Verapamil for Scott, that she had a duty to 
intervene under the circumstances, that she had plenty of time to intervene, 
that she said nothing and allowed the Verapamil to be administered, and that she 
may have breached her duty by failing to intervene. A member of the Medical 
Center’s administration with the authority to manage all nurses and paramedics 
at the Medical Center personally observed the events leading to the 
administration of Verapamil and failed to intervene. This is more than a 
scintilla of evidence supporting submission of ratification as a basis for 
imputing malice to the Medical Center. See, e.g., Lee Lewis, 70 S.W.3d at 
786 (upholding jury’s gross negligence finding when “C.L. Lewis admitted 
that even after observing KK Glass' ineffective fall-protection system, he 
did nothing to remedy it”) (emphasis added); Ellender, 968 S.W.2d 
at 922 (recognizing that a corporation is liable for gross negligence through 
the actions “or inactions” of a vice principal) (emphasis added); see 
also Burleson State Bank v. Plunkett, 27 S.W.3d 605, 619 (Tex. App.—Waco 
2000, pet. denied) (recognizing corporation is liable “if it acts maliciously 
through the actions of a corporate officer” and noting that officer acted 
maliciously by failing to explain true nature and terms of construction 
loan). Because legally sufficient evidence exists supporting ratification as one 
ground for imputing malice to the Medical Center, no Casteel/Harris County error 
was created by submission of ratification.
        Next, 
the Medical Center argues that the trial court’s instruction concerning 
ratification was legally incorrect. Explanatory instructions should be submitted 
when, in the sole discretion of the trial court, they will help the jurors 
understand the meaning and effect of the law and the presumptions the law 
creates. Pitts v. Sabine River Auth. of Tex., 107 S.W.3d 811, 819 (Tex. 
App.—Texarkana 2003, pet. filed). The trial court is given wide latitude to 
determine the propriety of explanatory instructions and definitions. Mobil 
Chem. Co. v. Bell, 517 S.W.2d 245, 256 (Tex. 1974); see also Ishin Speed 
Sport v. Rutherford, 933 S.W.2d 343, 350 (Tex. App.—Fort Worth 1996, no 
writ) (recognizing trial courts are given considerably more discretion in 
submitting instructions and definitions than in submitting questions). Moreover, 
a trial court may personalize or individualize a charge to the facts of the case 
so the jury can more easily understand the law. Rutherford, 933 S.W.2d at 
350.
        Here, 
the trial court instructed the jury that in order for the Medical Center to have 
acted with malice it must have acted through a vice principal or “the employer 
or a manager of the employer [must have] ratified or approved the act. A 
ratification may occur when the employer or its vice principal confirms, adopts, 
or fails to disagree with the acts of an employee.” The Medical Center 
contends that the “fails to disagree” language is legally incorrect; 
however, this is a legally correct definition of when malice may be imputed to a 
corporation through ratification. See, e.g., Lee Lewis, 70 S.W.3d at 786 
(recognizing corporation’s liability for gross negligence based on 
vice-principal conduct in doing “nothing to remedy it”); Ellender, 
968 S.W.2d at 922 (recognizing corporation’s liability for gross negligence 
may be based on “inactions” of a vice principal); Plunkett, 27 S.W.3d 
at 619 (recognizing corporation’s liability for gross negligence based on 
vice-principal’s action in “failing to explain the true nature and terms of 
the construction loan”). Therefore, the trial court did not abuse its 
discretion in submitting the ratification definition. We overrule Appellants’ 
second issue.
V. Failure to 
Find the Doctors Negligent
        In 
their fourth issue, Appellants contend that the jury’s failure to find Dr. Zeh 
and Dr. Osborne negligent is wholly contradictory to its findings that the 
Medical Center and Nurse Crain were negligent. This complaint is not preserved 
for our review because Appellants did not raise any contention concerning 
conflicting jury findings before the jury was discharged. See, e.g., Norwest 
Mortgage, Inc. v. Salinas, 999 S.W.2d 846, 865 (Tex. App.—Corpus Christi 
1999, pet. denied) (holding that to preserve error, appellant must object to 
conflict in jury findings before jury is discharged).
        Appellants 
also assert in their fourth issue that the jury’s failure to assess negligence 
against Drs. Zeh and Osborne was against the great weight and preponderance of 
the evidence. The jury, however, is the sole judge of the credibility of the 
witnesses and the weight to be given their testimony. Leyva v. Pacheco, 
163 Tex. 638, 641, 358 S.W.2d 547, 549 (1962). The jury may believe one witness 
and disbelieve another and resolve inconsistencies in any testimony. McGalliard 
v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986). This court cannot substitute 
its opinion for that of the trier of fact and determine that it would have 
weighed the evidence differently or reached a different conclusion. Hollander 
v. Capon, 853 S.W.2d 723, 726 (Tex. App.—Houston [1st Dist.] 
1993, writ denied).
        Here, 
the jury did not fail to find Drs. Zeh and Osborne negligent. The jury failed to 
find that “the negligence, if any, of [Dr. Zeh and Dr. Osborne] proximately 
caused the occurrence in question.” The jury could have believed that, 
although Dr. Zeh and Dr. Osborne were negligent, it was the negligence of Nurse 
Crain and the Medical Center that proximately caused the occurrence in question: 
the administration of the Verapamil by Johansen. The jury could have inferred 
that if Nurse Crain and Johansen had refused to participate in the 
administration of Verapamil to Scott, or if Nurse Heskes had questioned Dr. 
Zeh’s order, then the occurrence in question, the administration of Verapamil, 
would not have occurred.
        Additionally, 
the jury could have believed Dr. Osborne’s testimony that he never told Dr. 
Zeh to administer Verapamil to Scott and could have therefore concluded that Dr. 
Osborne was not negligent. The jury could have believed Dr. Zeh’s testimony 
that she thought Dr. Osborne told her to administer Verapamil to Scott. The jury 
could have concluded that Dr. Zeh’s reliance on information provided by a 
consulting cardiologist rendered her order for Verapamil nonnegligent. Evidence 
exists which the jury could have believed and concluded that Drs. Zeh and 
Osborne properly exercised the degree of care that an emergency room doctor and 
a cardiologist of ordinary prudence, respectively, would have exercised under 
the same or similar circumstances. We cannot agree that the jury’s failure to 
find that the negligence of Drs. Zeh and Osborne proximately caused the 
occurrence in question is against the great weight and preponderance of the 
evidence. We overrule Appellants’ fourth issue.
VI. Jury 
Argument
        In 
their seventh issue, Appellants complain that a comment made by Scott’s 
counsel during opening statements concerning Scott’s settlement with Drs. Zeh 
and Osborne was improper. Appellants failed to lodge a contemporaneous objection 
to the comments they complain about on appeal. Instead, they waited until the 
conclusion of Scott’s counsel’s opening statement and then moved for a 
mistrial. The trial court denied the motion for mistrial, and Appellants did not 
request an instruction to the jury to disregard the comment. Consequently, 
Appellants argue that the comments here were incurable by a jury instruction and 
require the granting of a new trial, despite the lack of a contemporaneous 
objection and the lack of a request for an instruction to disregard.
        Incurable 
jury argument occurs when comments are so inflammatory that their harmful nature 
cannot be cured by an instruction to disregard. Nat’l union Fire Ins. Co. 
of Pittsburgh v. Kwiatkowski, 915 S.W.2d 662, 664 (Tex. App.—Houston [14th 
Dist.] 1996, no writ.) There are only rare instances of incurable harm from 
improper argument. Standard Fire Ins. Co. v. Reese, 584 S.W.2d 835, 839 
(Tex. 1979). Although an offer in compromise and settlement is inadmissible as 
evidence, error in informing a jury of a settlement can be cured by an 
instruction to disregard. Tex. R. Evid. 
408; Beutel v. Paul, 741 S.W.2d 510, 513-14 (Tex. App.—Houston 
[14th Dist.] 1987, no writ); Parks v. Benson Co., Builders, 
393 S.W.2d 700, 703 (Tex. Civ. App.—Fort Worth 1965, writ ref’d n.r.e.). 
Therefore, the error here could have been cured by an instruction to disregard 
the comments concerning the doctors’ settlement with Scott. See Beutel, 
741 S.W.2d at 513-14; Parks, 393 S.W.2d at 703. Because Appellants did 
not request an instruction to disregard, their complaint is not preserved for 
our review. See, e.g., State Bar v. Evans, 774 S.W.2d 656, 658 (Tex. 
1989) (holding that failure to request an instruction to disregard waives error 
where instruction would have cured error). We overrule Appellants’ seventh 
issue.
VII. Medical 
Expenses
        In 
their sixth issue, Appellants contend that they are entitled to an offset from 
the jury’s award to Scott for past medical expenses. Specifically, Appellants 
claim they should be held responsible only for Scott’s past medical expenses 
that were actually paid by Medicaid. Appellants, however, failed to plead an 
offset. The right of offset is an affirmative defense. Tex. R. Civ. P. 94. The burden of 
pleading offset and of proving facts necessary to support it are on the party 
making the assertion. Brown v. Am. Transfer & Storage Co., 601 S.W.2d 
931, 936 (Tex.), cert. denied, 449 U.S. 1015 (1980). Regardless of the 
merits of Appellants’ argument that they are entitled to an offset, because 
they did not plead the affirmative defense of offset, this issue is waived. See 
id.
        Also 
under their sixth issue, Appellants argue that the evidence is legally and 
factually insufficient to support the jury’s award to Scott of ten million 
dollars for his future medical expenses.[10]  
Appellants contend that Scott was required to introduce expert testimony proving 
his life expectancy and future medical expenses within a reasonable medical 
probability. Scott, on the other hand, contends that neither his life expectancy 
nor his projected future medical expenses require expert testimony to a 
reasonable medical probability.
        To 
recover for future medical expenses under Texas law, the plaintiff must show 
there is a “reasonable probability” that such medical expenses will be 
incurred in the future. Brownsville Pediatric Ass’n v. Reyes, 68 S.W.3d 
184, 191 (Tex. App.—Corpus Christi 2002, no pet.). The plaintiff is not 
required to prove future medical expense based on “reasonable medical 
probability.” Furr's, Inc. v. Logan, 893 S.W.2d 187, 194 (Tex. 
App.—El Paso 1995, no writ). The court in Furr’s, Inc. rejected the 
exact proposition raised by Appellants here:
Furr's 
next urges that the jury's award for future medical care must be set aside 
because there is no evidence, based upon reasonable medical probability, as to 
the amount of money necessary to furnish Ms. Logan with future medical care. 
This is not the standard for determining future damages in personal injury 
cases. Texas follows the "reasonable probability" rule for future 
damages, including future medical expenses. City of San Antonio v. Vela, 
762 S.W.2d 314, 321 (Tex. App.—San Antonio 1988, writ denied); Hughett v. 
Dwyre, 624 S.W.2d 401, 405 (Tex. App.—Amarillo 1981, writ ref'd n.r.e.). 
The jury may make its award for future medical care based upon the nature of 
plaintiff's injuries, medical care rendered before trial, and the plaintiff's 
condition at the time of trial. Id. Plaintiff is not required to 
establish the future medical consequences of her injury by expert testimony 
based on reasonable medical probability.

Id. 
at 194; see also Pipgras v. Hart, 832 S.W.2d 360, 366 (Tex. App.—Fort 
Worth 1992, writ denied) (holding “[n]o precise evidence is required to 
support an award of future medical damages”). Although the preferred practice 
to establish future medical expenses is through expert medical testimony, no 
rule exists requiring that the plaintiff establish such expenses through expert 
testimony. Furr’s, Inc., 893 S.W.2d at 194; Thate v. Tex. & Pac. 
Ry. Co., 595 S.W.2d 591, 601 (Tex. Civ. App.—Dallas 1980, writ dism'd). 
Thus, an award of future medical expenses lies largely within the discretion of 
the jury. See Brownsville Pediatric Ass’n, 68 S.W.3d at 192.
        Likewise, 
Scott was not required to prove his life expectancy to a reasonable medical 
probability. In fact, such a burden of proof is impossible because life 
expectancy, by its very nature, is uncertain. Pipgras, 832 S.W.2d at 365 
(recognizing “life expectancy, medical advances, and the future cost of 
products, services[,] and money are not matters of certainty”). The trial 
court admitted the life expectancy tables into evidence. Appellants lodged no 
objection. Those tables show, and Dr. Allen Self (“Self”) testified, that a 
full life expectancy for Scott would be 78.33 years. Dr. Robert Shavelle (“Dr. 
Shavelle”) testified that Scott’s life expectancy was 8.1 years. Dr. 
Shavelle conceded that Scott could live longer than 8.1 years or less than 8.1 
years and agreed that he could not predict when Scott would die because “no 
one can predict how long anyone will live. No one knows -- no man knows the day 
or the hour.” Thus, we decline to hold, as Appellants urge, that Scott was 
required to prove his life expectancy to a reasonable medical probability.
        The 
nature of Scott’s injuries was not disputed. The evidence conclusively 
established that Scott has an anoxic brain injury from which he will not 
recover. Appellants’ expert testified that Scott’s “physical disability 
will continue.” Scott cannot speak or care for himself, has a tracheostomy and 
a feeding tube, has no bladder control, and is incontinent.
        Scott’s 
current treating doctor, Dr. Garry Pearson (“Dr. Pearson”), testified 
concerning Scott’s medical care rendered before trial, Scott’s condition at 
the time of trial, and the type of treatment Scott should have in the future. 
Scott resides in Four Seasons Nursing Home, but has been hospitalized at a local 
hospital three or four times for dental care, urosepsis, urinary tract 
infections, pneumonia, and sepsis. Scott has experienced several skin ulcers 
while he has been at Four Seasons, and he suffers from muscle contractures. Dr. 
Pearson testified that the Four Seasons was a geriatric facility for the most 
part and that, based upon a reasonable medical probability, Scott required a 
higher level of care than the geriatric patients at the Four Seasons. Dr. 
Pearson opined that the staff at Four Seasons did not have adequate time to work 
with Scott’s contractures and that, based on a reasonable medical probability, 
Scott “would be better suited in a facility that took care of patients that 
have Scott’s condition routinely.”
        Dr. 
Terry Winkler (“Dr. Winkler”), who is a medical doctor board certified in 
physical medicine and rehabilitation and is a certified life care planner, 
reviewed Scott’s medical records, examined Scott, visited with Scott’s 
mother, Norma, and visited with Dr. Pearson. He prepared two different life care 
plans for Scott outlining Scott’s future needs. These needs include on-going 
nursing care, physical therapy, a whirlpool to treat his skin ulcers, a suction 
machine, and other equipment and services.
        Dr. 
Self, an economist, used Dr. Winkler’s life care plan to project the future 
medical expenses associated with Scott’s care. Dr. Self testified that 
Scott’s future medical expenses would range between $7.2 million and $19.7 
million depending on Scott’s life span and the level of care provided. The 
jury awarded Scott $10 million for future medical expenses.
        Viewing 
only the evidence and inferences tending to support the jury’s future medical 
expenses award and disregarding all evidence and inferences to the contrary, we 
hold that the evidence is legally sufficient to support the jury’s award of 
$10 million for Scott’s future medical expenses. See Bradford, 
48 S.W.3d at 754; Brownsville Pediatric Ass’n, 68 S.W.3d at 192; Furr's, 
Inc., 893 S.W.2d at 194; Pipgras, 832 S.W.2d at 366. Further, 
considering all of the evidence, the evidence supporting the jury’s future 
medical expense award is not so weak, nor is the evidence to the contrary so 
overwhelming, that the answer should be set aside and a new trial ordered. See 
Garza, 395 S.W.2d at 823; Brownsville Pediatric Ass’n, 68 S.W.3d at 
192; Furr's, Inc., 893 S.W.2d at 194; Pipgras, 832 S.W.2d at 366. 
We overrule Appellants’ sixth issue.
VIII. 
Pre-Judgment and Postjudgment Interest
        In 
a postsubmission brief, Appellants assert that the judgment should be reformed 
to reflect a 5% pre and postjudgment interest rate. The judgment was signed on 
June 26, 2002, and Appellants filed their notice of appeal on September 20, 
2002. Almost a year later, the 78th Legislature amended the Texas 
Finance Code to reduce the postjudgment interest rates from 10% per year to 
“the prime rate as published by the Federal Reserve Bank of New York on the 
date of computation” or should the prime rate fall below 5%, to 5% per year.[11]  The amendments apply to a final judgment that is 
“signed or subject to appeal on or after the effective date of this Act.” Tex. Fin. Code Ann. § 304.003 (Vernon 
Supp. 2004).
        Appellants 
contend that because their appeal was pending in this court when the amendments 
to finance code section 304.003(c) became effective, the judgment is “subject 
to an appeal on or after the effective date” of the legislation and the new 
postjudgment interest rate should apply. They then argue that because existing 
section 304.103 of the Texas Finance Code provides that the pre-judgment 
interest rate is equal to the postjudgment interest rate applicable at the time 
of the judgment, the judgment’s prejudgment interest rate should also be 
changed to 5%. See Tex. Fin. Code 
Ann. § 304.103 (Vernon Supp. 2004).
        Statutory 
interpretation is a question of law. In re Canales, 52 S.W.3d 698, 701 
(Tex. 2001) (orig. proceeding). Our primary goal is to ascertain and effectuate 
the legislature's intent. Bragg v. Edwards Aquifer Auth., 71 S.W.3d 729, 
734 (Tex. 2002). In doing so, we begin with the statute's plain language because 
we assume that the legislature tried to say what it meant and, thus, that its 
words are the surest guide to its intent. Fitzgerald v. Advanced Spine 
Fixation Sys., Inc., 996 S.W.2d 864, 865-66 (Tex. 1999). We presume the 
legislature intended a just and reasonable result in enacting a statute. In 
re D.R.L.M., 84 S.W.3d 281, 290 (Tex. App.—Fort Worth 2002, pet. denied).
        The 
plain language of the amendments to section 304.003(c) provides that they apply 
to judgments “signed or subject to an appeal on or after the effective date of 
the Act.” The plain meaning of the phrase “subject to an appeal” when used 
to describe a judgment traditionally means that the judgment fully and finally 
disposes of all parties and all issues before the trial court and therefore is 
capable of being appealed. See, e.g., Law Offices of Windle Turley, 
P.C. v. French, 109 S.W.3d 599, 600 (Tex. App.—Dallas 2003, no pet.) 
(“In this case, we must determine whether a judgment that fails to dispose of 
a ‘counterclaim for filing a frivolous lawsuit’ is a final judgment subject 
to appeal.”) (emphasis added); Hartford Underwriters Ins. Co. v. Hafley, 
96 S.W.3d 469, 475 (Tex. App.—Austin 2002, no pet.) (“Thus, the final 
judgment of the district court, although subject to appeal, was final for 
purposes of the attorney's fees provision of the Act.”) (emphasis added); Saavedra 
v. Schmidt, 96 S.W.3d 533, 550 n.16 (Tex. App.—Austin 2002, no pet.) 
(“If the orders were indeed temporary orders, as opposed to a final order 
denying Saavedra's petition to enforce a child custody determination, those 
orders are not subject to appeal.”) (emphasis added); Qualia v. 
Qualia, 37 S.W.3d 128, 129 (Tex. App.—San Antonio 2001, no pet.) 
(“Accordingly, we hold the issuance of a Request for International Judicial 
Assistance under the circumstances present here is not subject to appeal.”) 
(emphasis added); Jordan v. Jordan, 36 S.W.3d 259, 262 (Tex. 
App.—Beaumont 2001, pet. denied) (“The Supreme Court found the trial court's 
judgment in the bill of review action was interlocutory and not subject to 
appeal because the order did not dispose of the case on the merits.”) 
(emphasis added). Thus, giving the statutory language its plain meaning, the 
amendments to finance code section 304.003(c) apply to cases where a judgment is 
signed on after the effective date of the Act and to cases where a judgment 
becomes subject to appeal, i.e., capable of being appealed, on or after the 
effective date of the Act.
        For 
example, a default judgment against one of several defendants that was signed 
before the effective date of the amendments would nonetheless be subject to the 
new postjudgment interest rate if a severance order was entered, severing out 
the plaintiff’s claims against the defaulting party, after the amendments 
became effective. Following the severance order, the default judgment would be 
subject to an appeal, i.e., would be capable of being appealed. Thus, the 
amendments would apply to the severed default judgment.
        When 
we interpret a statute we may also consider the legislative history of the 
statute and we must presume that the statute operates only prospectively unless 
it is expressly made retrospective. Tex. 
Gov’t Code Ann. § 311.022, .023 (Vernon 1998). Here, the legislative 
history concerning the amendments expressly indicates that they apply 
prospectively. Senate Comm., Bill 
Analysis, Tex. H.B. 4, 78th Leg., R.S. (2003); Senate Comm., Bill Analysis, Tex. H.B. 
2415, 78th Leg., R.S. (2003).
        For 
these reasons, we cannot agree with Appellants that the amendments’ 
subject-to-an-appeal language actually means pending on appeal and that, 
therefore, the amendments apply retroactively. Such a construction would mandate 
a recalculation of postjudgment interest in every single civil case involving a 
money judgment pending on appeal in all fourteen courts of appeal as of June 20, 
2003. We decline to adopt this construction in light of the plain language of 
the amendments, the indication in both Acts’ bill analysis that the amendments 
apply prospectively, and the consequences of a contrary construction. See 
D.R.L.M., 84 S.W.3d at 290 (recognizing that we will not construe a statute 
in a manner leading to a foolish result when another alternative construction 
was more probably intended).
IX. Conclusion
        Having 
overruled all of Appellants’ issues and having addressed the arguments raised 
in Appellants’ post-submission brief, we affirm the trial court’s judgment.


                                                          SUE 
WALKER
                                                          JUSTICE

PANEL 
B:   LIVINGSTON and WALKER, JJ.; and SAM J. DAY, J. 
(Retired, Sitting by Assignment).

DELIVERED: 
November 20, 2003
 
 

NOTES
1. 
Appellants’ issues are extremely long and multifarious. They are especially 
confusing because they are not restated within the body of Appellants’ brief, 
and in some instances, we cannot tell which arguments and authorities sections 
in the brief address which issues. Consequently, we address only the issues 
raised by arguments presented in the body of Appellants’ brief. See Tex. R. App. P. 38.1(h) (requiring that 
for an issue to be properly before this court, the issue must be supported by 
argument and authorities); Fredonia State Bank v. Gen. Am. Life Ins. Co., 
881 S.W.2d 279, 284 (Tex. 1994).
2. 
Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378 (Tex. 2000).
3. 
The argument and authorities portion of Appellants’ brief does not challenge 
the sufficiency of the evidence to support the jury’s negligence findings. 
Thus, this issue is not before us. See Tex. R. App. P. 38.1(h). We nonetheless 
include some of the negligence evidence in our review of the facts because this 
evidence touches upon the proximate cause and malice issues that Appellants have 
raised.
4. 
This is a flowchart showing the recommended sequence of medications for three 
types of tachycardia.
5. 
The Medical Center stipulated that Lisa Crain, Eric Johansen, and Alma Heskes 
were each within the course and scope of their employment with the Medical 
Center at the time of the events at issue in this lawsuit and that there need be 
no submission of any issue or instruction to the jury on this point.
6. 
In her responses to Scott’s requests for admissions, Nurse Crain answered 
“Admitted” to the following: “Admit to the Court and jury in this case 
that you did not question Kim Zeh, M.D., regarding Verapamil being given.”
7. 
Appellants contend that, because the jury answered “no” to special question 
number 5, the malice question as to Nurse Crain, Nurse Crain’s conduct cannot 
be considered in determining whether the Medical Center acted with malice. We 
need not address this contention because clear and convincing evidence exists 
supporting the jury’s malice finding even if Nurse Crain’s conduct is not 
considered.
8. 
Appellants’ second issue is:
Even 
if the record contains sufficient evidence on one theory of negligence asserted 
by Plaintiff, which Appellants do not concede, the record contains no evidence 
to support submission to the jury of any of the Plaintiff’s other four 
theories of negligence. Thus, the trial court‘s refusal to submit limiting 
instructions (in broad-form Question Nos. 1, 2, and 4), which would have 
restricted the jury’s consideration to only those negligence theories 
potentially supported by some conflicting evidence, constituted harmful error 
requiring reversal under Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378 
(Tex. 2000), and Harris County v. Smith, [96] S.W.3d [230] [(Tex. 2002)]. 
The same error occurred in Question No. 4, where the trial court submitted an 
instruction on ratification by the Hospital that was not supported by 
substantive law, that was legally incorrect, and that was not supported by any 
competent evidence. Because the jury was allowed to consider both a potentially 
valid theory for imputing malice to the Hospital and an invalid theory for 
imputing malice, the trial court’s submission in Question No. 4 constituted 
harmful error requiring reversal under Casteel and Smith.
Appellants’ 
brief nowhere mentions this specific issue, and the brief’s table of contents 
does not contain a page number where the argument concerning this issue, or any 
other issue, is set forth.
9. 
Although the Medical Center requested and tendered limiting instructions, it did 
not object to the broad-form submission of the negligence question.
10. 
The jury awarded the following damages: $10,000,000 future medical expenses; 
$140,000 loss of past earning capacity; $0 loss of future earning capacity; $0 
past physical pain; $0 future physical pain; $0 past physical impairment; $0 
future physical impairment; and $3,000,000 punitive damages.
11. 
Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1, sec. 304.003(c), 2003 Tex. 
Gen. Laws 2096, 2096-97 (amended 2003) (current version at Tex. Fin. Code Ann. § 304.003(c) 
(Vernon Supp. 2004)).